Good morning, Illinois, public court 1st district court is now in session. The 4th division, the honorable justice Thomas E Hoffman presiding case number 22 dash 009 people versus Jack well, please. Gentlemen, before we begin the oral. Ordinarily, we grant 15 minutes for the apple on 15 minutes for the upper league. And 5 minutes for rebuttal. However, in this particular case. The state filed a motion for leave to cite additional authority. Instead of merely writing a motion for leave to file additional authority. Listing the cases you wish we to look at. And stating that you believe they're relevant. The state chose to write an 8 page reply brief. Which is totally out of order. And I think the level of playing field we give the. Apple on an additional 5 minutes and argument if they choose to use it. So the time in this case will be 20 minutes for the apple on 15 minutes for the upper league. And 5 minutes in rebuttal. So. Gentlemen, you want to identify yourself and tell us who you represent. May please the court and counsel. I'm Robert Markfield. And I represent defendant appellant Jack. Well, what's in this matter? Counsel. I'm assistant state's attorney, James stump for the people of the state of Illinois. Okay. Counsel, you may begin when you're ready. Thank you, your honor. May please the court and counsel. I'm Robert Markfield. I represent. Jack well, what's in this matter? I would like to address both issues. First, the identification from video issue, and then briefly the, as applied proportionate penalties claim. Jack, well, foots was convicted of 1st degree murder in the shooting death of Arsenio. And Arsenio Allen outside of a convenience store. Largely based on the testimony of 2 police officers, Eric Lovato and Matthew birdsong were recognized or claimed to recognize foots from store surveillance video footage of the incident. This testimony should have been excluded because it did not satisfy the probative versus prejudicial balancing tests required as part of the quote unquote precautionary procedures mandated by the Supreme court court and people V Thompson, the nature and manner of the identification from video testimony was highly prejudicial with a disturbing potential consequence that the jury could have convicted a person who merely looked like the shooter depicted in the video. First, 2 police officers, not just one were allowed to testify that they recognized foots because they had seen him many times during the course of their patrols. And because they had each had one lengthy prior interaction with him. This tends inevitably to suggest that foots was engaged in criminal activity. The longer encounters certainly do. But even the shorter ones should suggest that the police were keeping tabs on foots and that they must therefore have had a reason to do so. Second, the court allowed Lovato to testify highly prejudicially that his identification of foots was accomplished by seeing surveillance video and then comparing it to foots' posted pictures on Instagram social media, an account to which Lovato said he had preexisting familiarity because foots was a rap musician and Lovato said he followed the local rap music scene. In Latimer, cited in the defendant's opening brief, the court found that an image to image comparison as opposed to an image to memory comparison was completely lacking in probative value because the jury was just as capable of comparing images. Now, even if here and I acknowledge the situation differs somewhat from Latimer in that the comparison here is not just like is not just recorded image to recorded image, but rather recorded image video to recorded image Instagram to witness memory. There's still a severe danger that matching images from different source had the ultimate effect of reinforcing the officer's possibly erroneous conclusion, given that recorded images are fixed and human memory is notoriously malleable. Every time you dip into the images, they're the same. But every time you recall something, you might recall it a little bit differently. Related to that, Lovato testified that he recognized foots from the surveillance video because foots was wearing a similar Adidas jacket to the one depicted in foots' Instagram photos, but tellingly did not testify at trial that he had ever seen foots wearing that jacket in person. Thus, Lovato drew an inference and conclusion that the jury could have drawn just as well on its own without the guidance of a police witness. Furthermore, the jury must have necessarily been left with a prejudicial impression that Lovato, just by virtue of his experience as a police officer, was more able than an ordinary layman to perform an image to image comparison. The jacket, I would add, had no unique or rare characteristics, but was just an ordinary sports jacket with the insignia of Adidas, a major sportswear company. Now, even if, for the sake of argument, the admission of the identification from video evidence was error only in part, say, Birdsong's testimony was permissible under the balancing test, but not Lovato's, or that both officers' testimony was permissible, but that the court should have nevertheless prevented the state from allowing Lovato to testify about his prior knowledge and subsequent use of foots' Instagram page, it was not harmless. Harmless, of course, requires a finding of no reasonable probability that the jury would have acquitted absent the error. The jury's three inquiries during a deliberation asking to review the video evidence or be allowed another look at the defendant reflects that the jury was initially uncertain to the extent that it needed multiple inputs, even after the close of evidence. And it also reflects, I believe, that they were focused on the images rather than the testimony of the single, you might say, non-image testimony, the child eyewitness, who I will now talk about. It is true that child eyewitness Bradley Fairchild identified foots as the shooter, both from an in-person lineup conducted nine days after the shooting and then in court. However, I submit that there's an unusual reason to doubt the reliability of this identification beyond his youth and beyond his evident hesitation in the courtroom. Namely, that there was another child who was walking right next to Bradley, his friend Donya Lee, who must have seen the same things as Bradley and from pretty much the same perspective, and yet did not identify foots from an array. So insofar as the non-exclusive five-factor test under Neal and Slim favors the reliability of Bradley's identification, it would also tend to show, to favor or show the reliability of Donya's non-identification. Bradley was shown a lineup nine days after—indeed, Bradley was shown a lineup nine days after the shooting. Courts have said, you know, that length of time is in the realm of reliability. But Donya was shown a photo array the very next day. So his identification—his non-identification in that regard, at least, must be deemed more reliable than Donya's, given the delay. That concludes the identification from video portion of my presentation. I would love to— Can I— Oh, yes, Your Honor. Even assuming that it was error to allow that testimony, in this particular case, the jury requested to see the defendant without his glasses, were brought into the courtroom to view the defendant, and then requested and were allowed to view the video again, allowing it to be paused. So your opponent's going to come in and say, you know, even if it was error, it's certainly harmless, based upon what the jury did. And it's fair to assume that the jury relied on their own observation. And consequently, even if it was an abuse of discretion to allow the testimony, it's harmless. Yes, Your Honor. I am going to challenge only the phrase, fair to assume. It could be read that way, potentially, but it also can be read that the jury was uncertain. They heard all the evidence. They saw him. They saw him sitting in the courtroom the whole time, unmasked, part of the way, even though it was, you know, still late COVID times. They saw the video, saw the state's montage at the end, and yet they still requested that material. Again, that suggests perhaps that the jury was wavering, that it was unsure. The evidence was complete. The jury had retired from deliberation, and still they needed more input. And also, I would say that it cuts against harmlessness, because they were focusing on the video identification, which is the subject of, you know, the argument and the challenge, and not on the Bradley's identification, which is a potential. Let's not miss the identification with the question of whether there was error that was harmless in allowing these police officers to testify. So, I agree with you, but the jury asked to see the video, and asked to see the defendant unmasked and without his glasses. They did see that, and they found him guilty. So, in light, in viewing the evidence in the light most favorable to the state, why can't we find this as harmless error? Well, I'm sorry, you know, harmlessness is not in the light most favorable to the state determination. I mean, it's the other way around. The burden is essentially on the state. Harmlessness requires a finding of no reasonable probability that there was error. Now, I do take your honor's point. I mean, the jury, it could indicate that the jury was just being thorough, but there's another equally plausible interpretation that I think cuts against harmlessness, given the harmlessness standard, and that's that the jury was hung up and confused. They needed additional input, and that close case, that closely balanced determination that the jury was making, is it him? Is it not him? We need to look at him more. We need to look at him again, see him again, see the video evidence again. They're doing that, and in their mind, they have Lovato and Birdsong's identification from video testimony, which sort of tips the balance in favor of, yes, it is. Can we just ask a follow-up question? Yes, your honor. Did the judge abuse the discretion in allowing Lovato to testify, or Lovato and Birdsong? Lovato should be treated differently, perhaps, than Birdsong? Yes, your honor. I, though in my brief, I do say both, but I think that Lovato's is by far the more prejudicial. First, because unlike Birdsong, he did not have a recent encounter, or a recent lengthy encounter. Birdsong allegedly stopped the person who he said was the defendant the day before, but Lovato, his only lengthy encounter with Foots was over a year before. Then in addition to that, you get into what is not a problem with Birdsong, but it's very much a problem with Lovato, looking at the Instagram and comparing the Instagram images to the video, to his memory, and also comparing the jacket in the Instagram, the Adidas jacket in the Instagram pictures to the video, and that's not, that doesn't even have memory in Foots, because he never testified that he saw the, saw in person, Foots wearing the jacket. It was a pure image to image comparison, at least with regard to the jacket. So, you know, Birdsong's testimony might have gone either way. It would have been a considerably harder argument for the defendant to make, frankly, without Lovato. But Lovato just sort of really tips it severely into prejudice, as opposed to probative. And you didn't need his testimony. There was, why two? Why not one? Why do you need two officers to testify? Identification from video. Counselor, you should really go to the second issue of the sentence, because you only have about five minutes left in the argument. Yes, Your Honor. Next, and briefly, I would like to make two points about whether the court sentence violated the proportionate penalties clause as applied to Foots for noncompliance with the youth sentencing imperatives set forth in Miller v. Alabama for constructive life sentences, recognizing, of course, that the law is not yet settled as to whether Miller analysis is even appropriate for the category of 18 to 21-year-olds with certain, and as applied proportionate penalties clause. And it would invoke Miller concepts, such as childhood trauma, to show that the sentence shocks, the constructive life sentence shocks the conscience. First, it is clear that the sentencing court disturbingly stated that Foots' multiple experiences of traumatic loss of family members and a close friend, particularly to gun violence and the crime-ridden neighborhood he grew up in, indicated that he, quote, and this is the judge's remarkable quotation from sentencing, had to grow up fast, unquote, almost as if these experiences, these traumatic experiences, this difficult upbringing were effectively aggravating. But there is nothing in Miller, and I would venture to guess, little in social science to indicate that the early trauma and loss, that early trauma and loss leads to maturity and self-restraint in young adults. Quite the opposite. Miller recognized that youths are often unable to extricate themselves from horrific crime-producing environments, but even so have elevated rehabilitative prospects as they experience cognitive and emotional maturation with age. Furthermore, 4.5-105, which may provide guidance in so far as it incorporates, statutorily incorporates Miller for defendants under 18, specifies childhood trauma and adverse childhood experiences factors that must be considered in mitigation, not that, oh, it shows that he grew up fast and must have had an adult's understanding and maturity. No. Second, as to whether Futz's sentence was buffer compliant in light of the parole eligibility statute, Futz asks this court to adopt the logic and holding of the People v. Gates, a case that the state acknowledged in its motion to cite additional authority. The Gates court noted that the opportunity for parole relief, as provided by the statute, unlike a day-for-day credit, is a highly uncertain prospect and its denial is insulated from judicial review. Thus, the parole statute falls far short of the, quote-unquote, meaningful prospect for release articulated in buffer and tracing back to Graham. Indeed, in strong language, the Gates court characterized the opportunity for release provided by the parole statute as closer to meaningless than meaningful. In this regard, and finally, I would like to briefly elaborate on a point raised in Futz's reply brief, and that I don't think was adequately really addressed in all of the case law that's out there. The parole statute instructs, by its plain language in section J-2, that the PRB, quote, shall not parole, unquote, the eligible person if it determines that the eligible person's release would deprecate the seriousness of his or her offense. This prescriptive language, shall not parole, would naturally tend to operate to defeat the countervailing requirement that the PRB, quote, shall consider, unquote, the diminished capacity of youthful offenders and their subsequent growth and maturity. This is because consideration is part of the deliberation process. But the phrase shall not parole goes to outcome. So it is very possible, nobody could say otherwise based on the reading of the statute, that Futz may show excellent rehabilitation and growth and still be denied based on the statutory requirement of shall not parole if doing so would deprecate the seriousness of the offense and there is no more serious offense than first degree murder. Thank you, Your Honor. That's my presentation. Any questions from the panel? I just have one question. Even if we would reverse or consider reversing, even the minimum is 45. It's 45, the de facto life sentence, the minimum would be 20 plus 25. So would that be a de facto life sentence? So even if we did grant a release and gave you a new sentence again, and the judge would give the minimum, would you be appealing that case as well? Yes, I believe that there's authority that where there's a constitutional proportionate violation, the court can go below the statutory minimum in that limited circumstance. Because the constitution, you know, obviously is superior to statutory law. So, I mean, I would be appealing it. Maybe it would be a harder road to hope, but yeah. Yes, Your Honor. It's the short answer. Okay, State? Good morning, Your Honors. Again, Assistant State's Attorney, James Stumpf for the people. And I'd like to start out by just apologizing for any appropriateness with respect to my motion to cite additional authority. I want to apologize to Your Honors and the defense. So I am sorry. I think you should be very, very careful because we might very well deny a motion to cite additional authority when it's really a servant library. So go ahead. Understood. Thank you, Your Honor.  So, I am sorry. I think you should be very careful. I know that the Defendant admits that maybe it said that the testimony satisfied the initial portion of the Thompson Inquiry, but the defendant claims that the testimony was more prejudicial than probative. Particularly, he issues with the what he classifies as brief encounters that the officers had with the defendant prior to the shooting. But the probative value of the officer's identification was exceptionally strong. Based on their prior encounters with the defendant, they were able to identify him as the individual caught on surveillance camera who shot and killed the victim here. And I submit that the prior encounters that these officers had were significant and were for them to make these identifications. Moreover, the prejudicial nature of having these officers come in and testify and identify the defendant as the individual caught on video was greatly diminished by the Thompson procedural safeguards that were implemented in this case.  It afforded defense counsel an opportunity to cross-examine the officers outside the presence of the jury. The trial court gave limiting instructions to the jury during trial and before deliberations. And on top of that, the trial court limited the officer's testimony, so they only testified as to how frequently they saw the defendant, how long they knew him, and what a few of But at no point did they specify or suggest that the defendant was involved in criminal activity during these prior interactions. So just with the Thompson analysis, the trial court did almost essentially everything it was supposed to. And the probative value of the officers being able to identify the defendant as the shooter on the surveillance video outweighed their prejudicial nature. However, even if this court were to find error, as this court alluded to earlier, it was harmless in light of the substantial amount of evidence proving defendant guilty here, particularly the eyewitness to the shooting and the surveillance video. I know the defendant takes issue with Bradley Fairchild, the eyewitness. But I submit that all of the vigorous factors which determine eyewitness credibility were met here. He was just a couple of feet from the shooting. If you're honest, watch this video. He walks right in between the defendant and the victim. He also recognized the victim, Mr. Allen. He saw him daily, had developed a relationship with him. He also remembers seeing the two men talking and the defendant walking away, and then the coming back and shooting the victim in the head. There were absolutely no inconsistencies in his testimony, despite this defendant's characterization as him hesitating, which isn't necessarily supported at all in the record. There was no inconsistencies in his identification. He was not impeached or contradicted once as to his identification. And I know the defendant takes issue with his age, but he was 13. This wasn't a four or a five-year-old. He was an adolescent. He was in middle school. And all of the vigorous factors that I mentioned weigh in favor of his credibility. I know the defendant relies on his friend, the other boy caught in the video, his inability to identify the defendant, but that has absolutely nothing to do with Bradley Fairchild's ability to identify the defendant. In addition to that, like I mentioned, you have the surveillance video. If you look at the video, particularly the angle where the camera is facing inside the convenience store, you see the defendant's face for a couple seconds. It's visible. It's brief, like I said, a couple seconds, but his face is visible. You see him, and you see it again with the camera facing towards the door that actually depicts the shooting. His face is visible for maybe a second or two there as well. The jury saw these clips during trial. They sat through the entire trial with the defendant present. They could see his face. They could see his face after his mask was removed during in-court identifications. And then during deliberations, they saw all the videos again, and they saw the defendant again without his face mask and I believe his glasses. So, in summary, even if the court were to find error in the omission of the officer's testimony, it was harmless in light of the substantial evidence proving the defendant's guilt, including the surveillance video and the credible eyewitness. Do your honors have any questions about the Thompson issue before I address the sentencing? The only thing I would ask is, isn't it inherently prejudicial whenever you have police officers participating in identifying alleged offenders or perpetrators? Go ahead. Oh, no. Well, Your Honor, that is why Thompson, I think, was established to minimize any prejudice. The procedural safeguards in Thompson was established to minimize that type of prejudice from juries being influenced or influenced by officers coming in to make such identification testimonies. That's why the limiting instruction was required and limiting the officer's testimony to not bring about fire-illicit acts. Don't ordinary jurors give more weight to a police officer's testimony than a lay witness? In other words, if you have a police officer testifying, doesn't the ordinary juror give that testimony more weight than a lay person or non-police officer? In other words, don't the public trust the police when they testify in court? Well, I suppose it depends on the juror. But I'm sure, Your Honor, yes, that potentially that's true. But I mean, that's why the limiting instruction is out. That's the point of the Thompson analysis. So the jury is not, you know, it says that they're not to draw any inference from the police officers testifying and that it's for them to determine what weight, if any, to give to them. Thank you. Okay, I'll address the sentencing issue now, unless Your Honor has any further objections or questions. All right. So the defendant's as-applied proportionate penalties claim that a 60-year sentence for he did not, in fact, receive a de facto life sentence because he is eligible for parole after serving 20 years of his sentence. And I know the Elliott court made a similar finding that the 20-year-old defendant, a 70-year sentence there was not a de facto life sentence because he was eligible for parole after 20 years as well. And I know the defendant claims that Elliott was incorrectly decided because the defendant says that Dorsey did not address the parole statute, but time credit instead. But to the contrary, Dorsey equated parole with good conduct credit in that under either it is a defendant's power to shorten his sentence. And I'd like to point out that the Dorsey court on paragraph, I think it's 52, said they flatly rejected the notion that good time, good conduct credit is not like parole because obeying prison rules does not demonstrate rehabilitation. Because Dorsey equated good conduct credit with discretionary parole, it is the defendant's earliest opportunity for release, which is relevant in determining whether his sentence constitutes a de facto life sentence. Here, the defendant's earliest opportunity for release is 20 years when he is eligible for parole. This is under the 40-year buffer line. So the defendant's sentence, 60-year sentence with the possibility of parole after 20 years is not a de facto life sentence. However, even if this court would disagree with Elliot and the cases that followed Elliot, with the exception of the majority in Gates, of course, his 60-year sentence with the possibility of parole was in no way cruel, degrading, or disproportionate to the nature of offense, so as to shock the community. One only has to look at the surveillance video to see how aggravating and how cold-blooded this murder was. This defendant shot and killed the victim, shot him in the head in broad daylight. The victim wasn't doing anything wrong. He was just standing there outside of the convenience store on the phone with his girlfriend and smoking a cigarette. He wasn't doing anything wrong. And the defendant is right in front of two children that walked right past him. And I'd also like to submit that the court specifically did state that it did consider all the factors it was required to consider when sentencing someone that was younger. So even if, whether entitled to these protections or not, the court said it had considered all those factors. I know the defendant takes issue with perhaps the court didn't address all of the factors under the 5-4.5-105, but I mean, there's only one case where it says the court wasn't required to articulate each and every factor, but it nevertheless said that it did consider all of them. And many of those points are prevalent in its analysis. I know the defendant takes issue with, in particular, one comment about the defendant having to grow up quickly, I believe. But the court nevertheless did acknowledge his age. It acknowledged he was 20, but it's my opinion, you know, that comment, from my reading of that comment, maybe it was a reason why the court decided not to give his age that much weight based on the mitigation presented. So I don't necessarily think that that comment was proper. So that is all I had to say on the sentencing issue, Your Honors. Do you have any questions for me? The only question I have, one of the questions I have is, how often does parole happen after 20 years for a person to be murdered? In other words, do you know, are you aware of how often it happens? Yes, Your Honor. Where a person applies for parole and after 20 years he sees them? In a case where they're an emerging adult, as they say, 20 years old? In other words, does it really translate into a meaningful opportunity for release when the parole board routinely doesn't provide parole? I mean, I don't know. Does the parole board routinely provide parole after 20 years? And what percentage of cases do you know? Sure. So I'm not an expert on parole, Your Honor. I know under the statute, he'd be required, he would be allowed, if after 20 years he denied, he'd be allowed the opportunity to apply again in 10 years. But it is my understanding, too, that there is some sort of a appeal process within the appeal, I'm sorry, within the parole review board itself. So I think after his final denial, he's allowed to have that denial reviewed by a different panel within the parole review board. That's my understanding. But it is for the, but it's ultimately, you know, so what qualifies as a meaningful opportunity for release? That's for the legislature to decide. It's the legislature's role to craft statutes and procedures and determine what constitutes a meaningful opportunity for release. And I know there's a lot of discussion on the legislative floor debate, like Senator Miller, it mentioned 18 to 21 year old offenders. And those are the principles behind this parole statute, Your Honor. So if it's denied after 20 and if it's denied after the additional 10, when's the next opportunity for parole? Unless there are any other questions, are there any other questions? My question was, if he's denied twice after 20 and after the additional 10, does that mean he doesn't have another opportunity to apply for parole? If he's denied twice? If Mr. Foote is denied twice. I'm sorry, Your Honor, I'm having difficulty hearing you. If Mr. Foote is denied twice for parole after 20 and after the additional 10, does he have another opportunity after that? No, he does not, Your Honor. It's my understanding, though, based on how the statute is written. Thank you. Absolutely. I think your time is about up. Thank you, Your Honor. Just for those reasons that we mentioned in our brief, we respectfully ask this court to confirm the defendant's conviction and sentence. Thank you, Your Honor. I'll make a few brief points. I think if it's all right, Your Honors, I would like to start with the proportion of since I think it's just been addressed and it's clear and I have less to say on that. The state referred to the phrase earliest opportunity for release. But as Your Honor recognized in his question, the buffer Ann Graham speaks of meaningful opportunity for release. Gates says, do not let the word meaningful do too much heavy lifting. I mean, what in the statute makes parole more likely than, say, executive clemency? And if executive clemency is enough, then the whole buffer line disappears because every executive clemency from the governor. It has to be a meaningful opportunity for release. Yes, there's a deliberative process contained entirely in the parole review board. But that is, I would say, counterweighted, overwhelmed maybe by the fact that the statute has instructions about the conclusion that the parole review board has to reach after the deliberative process. Shall not, shall not parole, shall not parole if doing so would deprecate the seriousness. Oh, and I'd reiterate that, yes, the trial court did talk about his youth, but then seemed to suggest, I think it's an important quote, that his youth was essentially, in effect, an aggravating factor because he grew up fast. So what does youth matter if he had to grow up fast?  Now, on the Thompson issue, I would concede a trial court and this court has a difficulty in that, in a way, probativeness and proportionality and prejudicial rise at the same time. That is why even, I mean, even though Thompson was decided in 216, it's a pretty recent case with very little on the probative versus prejudicial precautionary procedure in this context. I would urge this court to take, to review carefully and trial courts to consider carefully this balancing test because it is extremely prejudicial. I mean, this is the fail safe. This isn't just like, we've conducted the test, that's fine. This is an essential instrument built into the Thompson ruling to exclude prejudicial so-called identification and it would seem to be extremely prejudicial that these two officers say, yeah, we saw him all the time for brief seconds. That suggests they're keeping tabs on it. And also Lovato's unusual image-to-image testimony, recognizing him not only for memory or not at all for memory, but by comparing images. Here's a police officer testifying to that. That surely had an effect on the jury's deliberative process. To harmless error, Fairchild's hesitation. I mean, I would say that the record supports that. It doesn't appear in the post-trial motion, but the defense talked about it in closing argument and also the prosecutor talked about it in rebuttal closing argument. Yeah, there was hesitation, but that means that Bradley was taking this all seriously or words to that effect. So the record does say without contradiction that there was hesitation in terms of the identification. As to whether Fairchild's identification was pure, well, I'm not so sure. He testified that he didn't see the gun before the shooting in the hand of the defendant allegedly. The video, if your honors watched the video clip in which Fairchild appears, it is very fast. I mean, the shooter walks by them around the corner, turns and shoots and there's chaos. So I am not sure, I mean, that opportunity to view necessarily falls in favor of the state. But even so, even if the slim factors, the Neil slim factors do slightly favor the state, it's the five factor test is non-exclusive, non-exclusive. And here we have this extraordinary additional bit of information, namely that there was a person standing right next to another child standing right next to Bradley. Same view, one of them would assume same perspective, all the factors, opportunity to view, degree of attention, I assume. And he was shown a array in which Futz appeared, did not identify. And that was one day after as opposed to Bradley's nine. So in terms of, I think that it significantly overstates to say that Bradley's identification was uncontradicted, pure and highly reliable. I don't think that that's the case. That's all I have. And I would be happy to answer any questions in my limited remaining time. Counselors, thank you very much. The matter will be taken under advisement in a dispositional issue, of course. Thank you. Thank you, Your Honor.